IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF GEORGIA
ATLANTA DIVISION

MILTON MYRIE

     Plaintiff,

v.

CITY OF SOUTH FULTON, GA

     Defendant.

Civil Action No.:

<u>Jury Trial Demanded</u>

## **COMPLAINT**

COMES NOW Plaintiff, Milton Myrie, by and through his undersigned counsel, and file this employment discrimination lawsuit against the City of South Fulton, GA, ("South Fulton" or "Defendant"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e-2(a), ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and the City of South Fulton's CROWN Act, Ordinance No. 2020-035 ("Crown Act").  Plaintiff is a former employee of the City of South Fulton Police Department and brings this action to hold the City accountable for subjecting him to unlawful discrimination on the basis of his religion and sex, by ordering him to cut off his religiously significant natural locs, while allowing female officers to maintain their locs.

1

Myrie was forced to resign his position on or about February 15, 2023, after enduring humiliating gender-based double standards regarding grooming requirements and being denied a reasonable accommodation for his religious requirement of wearing natural locs.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over the federal claims asserted in this action under 28 U.S.C. §§1331, 1337 and 1343.  This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e-2(a), ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), as Defendant is located in this District and division, and the events or omissions giving rise to the claims occurred in this District and division.

3.     Municipal law claims "form part of the same case or controversy" as a federal claim, when they derive from a "common nucleus of operative fact" and "would ordinarily be expected to be resolved in one judicial proceeding."  Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over the municipal law claim Plaintiffs assert, which are related to claims within the court's original jurisdiction.

## PARTIES

4.      Plaintiff Milton Myrie (hereinafter, "Myrie") is a resident of Fairburn, Georgia, and at all times relevant to this complaint, was employed by the City of South Fulton as a Police officer.

5.      Plaintiff was a covered employee under Title VII and the City of South Fulton's CROWN Act during the period in which he was employed by Defendant.

6.      Defendant is an employer as defined by Title VII and the City of South Fulton's CROWN Act, and is therefore subject to their provisions.

7.      The City of South Fulton is a municipality of the State of Georgia and is responsible for the funding and operation of the South Fulton Police Department. The City of South Fulton may be served with summons at 5440 Fulton Industrial Blvd, Atlanta, Georgia 30336.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      On February 14, 2023, Plaintiff timely filed a charge with the Equal Employment Opportunity Commission ("EEOC") and an amended charge on February 17, 2023, alleging retaliation under Title VII. Plaintiff received a right to sue letter on or about September 19, 2023. *See* Ex. A (Right to Sue Letter). This lawsuit was initiated prior to his statutory deadline of 90 days.

## FACTUAL ALLEGATIONS

9.      Plaintiff, Milton Myrie, was employed by the City of South Fulton Police Department ("CSFPD" or the "Department") as a Police Officer from February 16, 2021 to approximately February 15, 2023.

10.     Myrie is a 36 year old African-American male who is a devout member of the Rastafarian faith community.  In accordance with his sincerely held religious beliefs, he wore a long natural locs hairstyle.

11.     In his faith tradition, the locs symbolized his connection to biblical wisdom and served as his spiritual energy conductors.  According to his faith traditions, locs are believed to be a part of the Nazarite vows of Leviticus, which cautioned against shaving the head's four corners.  Locs also have connections to the Lion of Judah, which represents the power and strength of a person.

12.     Myrie's faith and hair locs were a source of comfort and stability in his life.  He had a deep and personal spiritual connection to his hair locs, and would not have cut them if he knew he could have kept them in accordance with federal law and the City's CROWN Act.

13.     On November 10, 2020, the City of South Fulton passed and adopted its own CROWN ACT ordinance.  CROWN stands for Create a Respectful and Open World for Natural Hair.  The Act took effect on November 10, 2020, when it was signed by the City's Mayor and received by the City Clerk.  This ordinance

4

makes it unlawful to require a person to discard their natural locs, as a condition for employment.

14.    Myrie applied for a police officer position on the City's website. Between December 2020 and January 2021, he completed a background check, psychological evaluation, physical performance test, medical examination, drug test and written and polygraph test.

15.    Myrie officially accepted the position on or about January 3, 2021, after passing the polygraph test.  He was told that he was being hired as a trainee and that all he had left to do was complete a final interview and sign his offer letter, before starting his academy training.

16.    Myire relied on that information and moved his family to Atlanta from New York, so he could start his 11 week academy training.   After moving his family to Atlanta, he reported to the recruiting office on January 25, 2021.

17.    Moments prior to signing his offer letter on January 25, 2021, former Deputy Chief Connie Rogers told Myrie that, in order to work for the City of South Fulton, he had to cut off his locs.  Myrie previously met with recruiters and supervisors at least three times prior to January 25, 2021, and this was the first time that anyone mentioned that his locs were unacceptable.

18.    Myire was horrified at Roger's statement, and felt that he was being asked to abandon his faith in order to accept a job opportunity that he worked hard

to secure.  He had grown his locks for 20 years, in accordance with his Rastafarian religion, and on a single day, he was asked to turn his back on everything he believed in.

19.    Ironically, Rogers had also locs and was allowed to maintain her employment, which further supports Myrie's claim that Defendant applied a sex-based double standard to Myrie's request for accommodation.

20.    Myrie discussed with a Lt. Tiffany Kendrick that he had prior employment with law enforcement where he was provided a religious accommodation waiver for his locs.  Myrie asked her if there was a policy by which he could receive a religious accommodation waiver and she told him there was none.

21.    Lt. Kendrick told Myrie that he could only be accommodated for his beard, with a doctor's note.  (See Ex. C - Perry Declaration at ¶ 6).  Lt. Kendrick essentially doubled down on Rogers' instruction to Myrie that he had to cut his locs.

22.    Myrie was told by both Kendrick and Rogers that he would have to cut his locs.  Since Myrie was new and they were senior officers, he was justified in relying on their mischaracterizations of the City's policies.  They failed to explain that there were options for accommodating Myrie's locs, according to the City's Crown Act and Title VII.

23.    Kendrick and Rogers' abbreviated response obstructed any further conversation regarding the accommodation request and the City made no good faith effort to engage in bilateral cooperation in the search for an acceptable resolution.

24.    Police Cadet Candidate Breejea Perry witnessed Defendant's recruiters discussing how they could "get in trouble" if Myrie complained about being required to cut his locs. (See Ex C - Perry Decl. at ¶ 9).  Perry also witnessed Myrie explaining to the recruiting officers that Rogers told him that he had to cut his locs if he wanted to keep the job.

25.    Additionally, Perry witnessed Myrie informing Lt. Kendrick that he received a religious accommodation for his locs from a former employer.

26.     Perry witnessed Lt. Kendrick respond by telling Myire "that there were no accommodations available for hair on top of his head but that he could seek an accommodation to maintain his beard, with a doctor's note." (See Ex C - Perry Decl. at ¶ 6).

27.     Perry observed that once Myrie left the room, Lt. Kendrick commented to others in the room, "why y'all tell him to cut his locs?  We can get sued for that." (See Ex C- Perry Decl. at ¶ 8 - 9).

28.    In order to accept the City of South Fulton's offer of employment as a police officer, Myrie cut off his locs on January 26, 2021, which was one of the

most traumatizing experiences of his life.  To comply with the hairstyle policy as explained to him by Deputy Rogers, he repeatedly shaved his hair to keep it below two inches.

29.    Shaving off of his hair locs has caused him to become anxious and depressed.  This required shaving of his head has resulted in a chronic skin condition (Pseudofolliculitis barbae) which caused him to be unable to grow his locs back.

30.    Myrie worked in isolation during his overnight shift and rarely saw any new officers unless there was a special gathering of some kind.  Myrie saw several female officers with locs, but assumed that they were allowed to wear their locs because they were females based on the information he received from Rogers and Kendrick.

31.    Tyler McDonald, a male officer who worked on the same overnight shift as Myrie, confirmed that because they worked overnight, they had limited exposure to meeting officers whom they had not already met.  McDonald also stated that he had not encountered any male officers with locs on the overnight shift. (See Ex D - McDonald Decl. at ¶ 4).

32.    A special holiday gathering on December 22, 2022 is when Myrie met Officer Johncephius Gunn for the first time and learned that he had been misled

8

regarding the availability of accommodation options.  Officer Gunn wore long locs

and was allowed to attend the academy with his locs.

33.    Officer Gunn informed Myrie that he was also asked by Deputy Chief

Connie Rogers to cut his locs if accepted a job offer. (See Ex E - Gunn Declaration

at ¶ 4).  Officer Gunn specifically recalls that the Deputy Chief asked him if he

would be willing to cut his hair if hired, and that Major Johnson stated that he had

to cut his locs for safety reasons.

34.    Officer Gunn was disturbed by the request because he wore his locs

for cultural reasons, and complained to the recruiters about having to cut his locs.

The recruiters told him to hold off on cutting his locs and later informed that he did

not have to cut his locs, with no further explanation.

35.    During the next several weeks, Myrie asked questions of his

supervisor regarding the right to a religious accommodation for his locs.  His

inquiries were met with avoidance and conflicting information, so he then

consulted Human Resources.

36.    On or about February 9, 2023,  Myrie spoke to HR Director Hope

Blakely on the phone and inquired about why he was not allowed to keep his locs.

She sent him a policy stating that he could not have attended the academy unless

his hair was cut lower than 2 inches.  This was the first time he was provided with

a copy of the policy, which was well after he had already complied with the instructions that he cut his locs and was unable to grow them back.

37.     Myrie noticed that the policy mentioned an exception for religious accommodations, and he asked Ms. Blakely about it.

38.     Ms. Blakely stated that in some limited cases the City could accommodate locs if the appropriate paperwork was submitted.

39.     Myrie told Ms. Blakely that Deputy Rogers and Lt. Kendrick did not inform him that there was an accommodation process for his locs, and they made him cut off his locs.

40.     Myrie submitted a formal complaint to HR on February 9, 2023.  In his complaint, he stated that he misinformed about his right to a religious accommodation, and explained the emotional turmoil he endured as a result of the violation of his right to a religious accommodation.

41.     After submitting his complaint, Myrie learned the City had violated its own CROWN ACT law, as well as Title VII of the Civil Rights Act of 1964, by requiring him to cut off his locs.

42.     Myrie would never have cut his locs if he knew that Defendant could have accommodated his locs in a manner consistent with Title VII and the City's CROWN Act.

43.     Despite his due diligence in repeatedly asking his superiors about the religious accommodation policy, he was unable to obtain vital information bearing on the existence of his legal right to a reasonable accommodation until he spoke to HR on February 9, 2023.

44.     Myrie kept reflecting on the fact he could have saved his locs had he not been misinformed by trusted supervisors.  He grew so frustrated and angered by this egregious violation of his civil rights that he resigned from his position.

45.     Myrie was not the only male officer Defendant pressured to cut off their locs, well after the City passed its CROWN Act policy.  For example, in July 2022, Officer Johncephius Gunn was also asked by Deputy Chief Connie Rogers to cut his locs in order to accept a job offer. (See E - Gunn Decl. at ¶ 4).

46.     Another officer, Tyler McDonald, confirmed that Defendant also pressured him to cut his hair in order to keep his position.  McDonald recalls that, after he returned from a leave of absence on or about May 2, 2022, Lt. Roxane Shoemaker and Sgt. Marilyn White kept pressuring him to cut his locs.  Like Myrie, he complied because he did not want to lose his job. (See D - McDonald Decl. at ¶ 6-10).

47.     Deputy Chief Roger's documented interaction with officer Gunn corroborates Myrie's allegation that he was also told by Rogers that he would need

to cut his locs to start his job, and that Myrie was not informed of any viable religious accommodation options.

## COUNT I
## Title VII of the Civil Rights Act
## (Failure to Accommodate Religious Hairstyle)

48.     Plaintiffs re-allege the foregoing allegations as if set forth herein.

49.     The language of Title VII is clear that once learning of an employee's need for religious accommodation, an employer has an obligation to reasonably accommodate the individual's religious practices. See 29 C.F.R. § 1605.2(c)(1).

50.     Defendant engaged in unlawful employment practices, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by failing to reasonably accommodate Plaintiff's sincerely held religious beliefs and requiring him to cut his locs as a pre-condition of his employment.

51.     The majority of the department is African-American, and its leaders understand that locs are commonly associated with the Rastafarian culture and religion.

52.     Plaintiff inquired about whether he could receive religious accommodation, similar to the one granted by his previous employer.

53.     Defendant denied Plaintiff's accommodation request and misled him into believing that its policy required him to cut his locs.

54.     Granting his request would not have caused Defendant any undue hardship, in light of the fact that it was already allowing female officers to keep their locs.

55.     The City's unlawful employment practices have deprived Plaintiff of equal employment opportunities and otherwise adversely affected his employment status because of his religion.

56.     The unlawful employment practices complained of in the above paragraphs above were intentional.

57.     Their unlawful employment practices were done with malice and with reckless indifference to his federally protected rights.

58.     As a direct and proximate result of South Fulton's violation of the Title VII and its own CROWN ACT, Plaintiff suffered compensatory damages including mental anguish, emotional distress, anxiety, and economic damages including lost income.

**COUNT II**
**Title VII of the Civil Rights Act**
**(Failure to Engage in the Interactive Process)**

59.     Plaintiffs re-allege the foregoing allegations as if set forth herein.

60.     Defendant was aware of or had reason to be aware of Plaintiff's desire for a reasonable accommodation, and such awareness triggered Defendant's duty to

engage in the interactive process with the aim of reaching a reasonable accommodation.

61.    Defendant could have implemented a reasonable accommodation for Plaintiff's locs, and no undue hardship would have resulted.

62.    Plaintiff was sufficiently cooperative by alerting Defendant to his need for a religious accommodation when he informed Lt. Kendrick that his locs were accommodated by his previous employer.

63.    Defendant's abbreviated and evasive response to Plaintiff's requests obstructed any further conversation regarding the accommodation request and Defendant demonstrated no good faith effort to engage in bilateral cooperation in the search for an acceptable resolution.

64.    When Plaintiff inquired about an accommodation and/or when it became clear that he may need accommodation, supervisors failed to provide Plaintiff with a copy of the CROWN Act policy and failed to refer him to Human Resources for additional information regarding his right to accommodations. Instead, the supervisor falsely informed Plaintiff that there were no accommodation options available for his locs.

65.    The EEOC's Compliance Manual reminds employers that they can not simply tell an employee who needs an accommodation that its policies must be strictly adhered to.  The manual states that "the employer's duty to accommodate

will usually entail making a special exception from, or adjustment to, the particular requirement that creates a conflict so that the employee or applicant will be able to observe or practice his or her religion." See *EEOC Compliance Manual Section 12: Religious Discrimination* at 12-IV(a) (Jan. 15, 2021).

66.     Defendant's statement to Myrie that no accommodation options were available for his locs demonstrated a clear unwillingness to consider adjustments to its grooming policies, and hindered any meaningful discussion of whether a specific adjustment would have caused an undue hardship.

67.     Had Plaintiff been allowed, he could have easily concealed his locs under his service hat as he did during his prior service in law enforcement.  The attached picture shows that Myrie's locs were completely concealed under his service hat. (See Ex B - Photo)

68.     The instructions Plaintiff received from Rogers, Kendrick and Blakely were all indicative of accommodation avoidance tactics that have deprived him of his civil rights.

**COUNT III**
**Title VII of the Civil Rights Act**
**(Sex  Based - Disparate Treatment)**

69.     Title VII prohibits sex based discrimination in any terms and conditions of employment, including grooming policies.

70.    Defendant's grooming policies were not equally applied to male and female officers.   Defendant applied a sex-based double standard to Plaintiff's request for accommodation.

71.    Plaintiff, and two other male officers were told that they had to cut their locs.

72.    Defendant did not require female employees to cut their locs to accept or maintain a position.

73.    Deputy Chief Rogers has locs and was allowed to maintain her employment.   Female officers Gadson and Cooper were also allowed to keep their locs.

74.    Female officer Perry confirmed that female officers were not instructed to cut their hair, while male officers Tyler McDonald, and Johncephius Gunn state that they were told that they had to cut their locs. (See Ex D - McDonald Decl. at ¶ 6-7, Ex E - Gunn Decl. at ¶ 4, 12; Ex C - Perry Decl. at ¶ 10).

75.    Plaintiff recalls seeing at least 8 females with the locs before seeing one male with locs at a holiday party on December 22, 2022.  The male officer with locs whom Plaintiff met at the party, Johncephius Gunn, confirmed that he was also told that he had to cut his locs. (See Ex E - Gunn Decl. at ¶ 9, 12).

76.    The violations of Plaintiff's civil rights was willful and intentional. Cadet Candidate Perry observed Lt. Kendrick saying to the female recruiters,

"Why y'all tell him to cut his locs?  We can get sued for that." (See Ex C - Perry Decl. at ¶ 8).  In light of her telling Myrie that his beard could be accommodated, Lt. Kendrick appears to have understood the illegality of denying him accommodation for his hair locs.  This evidences a willful violation of the federal law and a violation of the City's CROWN Act.

### COUNT IV
### City of South Fulton CROWN Act
**(**Ordinance No. 2020-035**)**

77.    Plaintiff re-alleges the foregoing allegations as if set forth herein.

78.    Defendant's City Council passed and adopted the CROWN Act on November 10, 2020, which effectively became law and policy in the City of South Fulton, superseding all previous statements of policy regarding personal appearance.  The CROWN Act states, in relevant part:

> "WHEREAS, the City Council desires to make certain that residents and religious groups do not face natural hair discrimination in the workplace . . .
>
> THE COUNCIL OF THE CITY OF SOUTH FULTON HEREBY ORDAINED as follows:
>
> . . . it shall be unlawful for any … hiring personnel to discriminate against any person in any way which would deprive or limit such person's employment opportunities or otherwise adversely affect their status as an applicant for employment with regard to tenure, compensation, promotion or discharge because of hairstyles and protective and cultural hair textures and hairstyles." . . .

79.     Section 15-9002 of its CROWN Act specifically defined protective and cultural hair textures and hairstyles as, including "braids, cornrows and **locs** . . . whether or not hair is adorned by . . . headwraps." [Emphasis added]  Section 15-9003 of the CROWN Act clearly prohibits limiting an employee's employment opportunities because of their cultural or religious hairstyles.

80.     Since the CROWN Act was enacted over two months prior to the date Plaintiff was made to cut his locs, the City's Chief of Police and the police department leadership knew or should have known that they could not require employees cut their natural locs in order to accept or maintain a position in the police department.

## PRAYER FOR RELIEF

1.  Wherefore, Plaintiff demands judgment against Defendant as follows:

    a.  All damages that may be awarded under Title VII of the of the Civil Rights Act of 1964, ("Title VII") and the City of South Fulton's CROWN Act,  including lost wages and back pay; general compensatory damages including but not limited to damages for mental anguish and emotional distress;

    b.  Punitive damages to the extent allowed by law;

    c.  Special damages to the extent allowed by law;

18

d.  Injunctive relief under Title VII and the City's CROWN Act

preventing and prohibiting Defendant from engaging in its

present practices in violation of the laws cited herein;

e.  Reasonable attorney's fees and expenses and costs pursuant to

42 U.S.C. §1988;

f.  Such other relief as this court deems just and appropriate.

Respectfully submitted, the 3rd day of December, 2023.


/s/ Arnold J. Lizana
Law Offices of Arnold J. Lizana III
GA Bar No.: 698758
1175 Peachtree Street NE, 10th Floor
Atlanta, GA 30361
T: (404) 207-1559
F: (470) 231-0672
alizana@attorneylizana.com

**ATTORNEY FOR PLAINTIFF**

19